SMITH, Administrator of JOSEPH WARD, deceased, v. THE NEW YORK CENTRAL RAILROAD COMPANY.

*It seems*, that the owner of cattle, transported for hire on a railroad, and who goes along in charge of them, under a contract that "the persons riding free to take charge of the stock do so at their own risk of personal injury from whatever cause," is not to be regarded as a gratuitous passenger. *Per* WRIGHT, DENIO, and DAVIES, Js.

Whether, as to one who, in the manner stated, gives some consideration for being carried, a contract is valid which aims to exempt the carrier from liability for damages resulting from the negligence of his servants. *Quære.*

The owner of cattle traveling in charge of them, under such a contract, and paying no independent consideration for the conveyance of himself, was injured by the gross negligence of an agent of the carrier in using an unfit and dangerous car. The carrier was held liable by a divided court, four of the judges going on the ground that the contract for exemption from liability was void, as against public policy; and the fifth, that the negligence, as it respected the machinery of transportation, is imputable to the carrier himself.

APPEAL from the Supreme Court. Action, under the statute of 1847, for damages from the negligent killing of the plaintiff's intestate, while a passenger on the defendant's railroad. On the trial, these facts appeared: The deceased made a written contract with the defendant for the transportation, from Buffalo to Albany, of two car-loads of hogs, for $67 per car. The contract recited that they were carried at a reduced rate, in consideration of the owner's assuming certain specified risks in respect to the safety of the hogs

during the transit. It contained this clause: "It is further agreed that the said Ward is to load, tranship and unload said stock at his own risk; the said New York Central Railroad Company furnishing the necessary laborers to assist. And it is further agreed that the persons riding free to take charge of the stock do so at their own risk of personal injury from whatever cause." Ward went upon the train in charge of his hogs. He paid no fare for his own conveyance otherwise than as a consideration for carrying him may be found in the above contract. He was furnished with a drover ticket, passing him free over the road; the terms of which were not otherwise shown than by evidence of the printed form of such tickets then used by the corporation, viz.: "Pass ———, in charge of cars of stock, on account of ———. Takes all the responsibility as to the injury of himself or stock."

At Rochester the car in which Ward and other drovers had ridden from Buffalo was taken from the train, and an old emigrant car, unsafe, by reason of having a flat wheel, was substituted; the attention of the conductor was called to its condition and unfitness. The train proceeded to Oriskany, where this car was thrown off the track, and Ward was killed. The judge charged the jury to find for the plaintiff, if the death of the intestate was caused by gross negligence on the part of the defendant's or its agents, without fault on his part. The plaintiff had a verdict. The defendant's exceptions were argued, in the first instance, at general term, in the third district, and judgment rendered for the plaintiff. The defendant appealed to this court.

*Sidney T. Fairchild*, for the appellant.

*John K. Porter*, for the respondent.

WRIGHT, J. It is no longer an unsettled question in this State that a common carrier of property may, by special agreement, restrict his common-law liability. (*Dorr* v. *Steam Navigation Company*, 1 Kern., 485, and cases cited.) There are no

controlling considerations of public policy against permitting such carrier to limit the liability which the law imposes on him, by express agreement with the owner of the property; and as the public interests are not to be affected, there can be no valid objection to the parties changing their relation in a particular transaction, by special agreement, so that the carrier instead of being an insurer against all except the act of God and the public enemy, shall become, as to that transaction, an ordinary bailee and private carrier for him.

A carrier of persons is not deemed a common carrier, nor is he subjected by law to like obligations. He is not an insurer, or responsible for anything but his own negligence, and that of his agents and servants. But in respect to this, he is held to a stringent duty and accountability; and the degree of duty is obviously to be measured by the dangers which attend the carriage, and the control which the carrier lawfully exercises over both vehicles and roadway. A carrier of passengers, by coach, on a public highway would be accountable for the negligence of the person whom he places in charge of the vehicle, and his own also, if injury occurs from the unfitness or defectiveness of such vehicle. The measure of his duty is to provide competent and skillful drivers, and sufficient and road-worthy carriages. A carrier of passengers by railroad (such road being operated by the carrier) is responsible for the negligence of his agents and employees in charge of the vehicles and the roadway also, and his accountability extends not only to the conduct and management of the railroad, so far as relates to the transit, but also to the sufficiency of the vehicles and the road itself. When a railroad company is the carrier, the duty rests on such company, not only to provide safe vehicles, but a safe roadway; and in view of the dangers which attend railroad carriage, its duty is not limited to such precautions as it is apparent, after an accident, might have prevented the injury, but such as would be dictated by the utmost care and prudence of a very cautious person before the accident, and without knowledge that it was about to occur. It is plain, as was said by JOHNSON, Ch. J., in *Bowen* v. *New York*

*Central Railroad Company* (18 N. Y., 408), that the utmost foresight as to possible dangers, and the utmost prudence in guarding against them, are the only limits which a decent regard to the safety of men, and a conformity to the established principles of the law, allow to be fixed to the responsibility of those who conduct and manage railroads. As to them, unless this degree of foresight and prudence be exerted, the presumption of negligence arises, and they will be re· sponsible.

I am not aware of, nor have we been referred to, any case holding that a carrier of passengers by railroad may lawfully contract with a person offering to be carried against the consequences which the law attaches to his negligence, nor that the present defendants who are constituted by stâtute carriers of passengers, absolutely required to transport them, empowered to regulate the time and manner in which they shall be transported, and made liable for any damages occasioned by their neglect of duty, may contract to relieve themselves from this liability, or to assume any other character than that given to them by the statute. (Laws of 1850, chap. 140, § 1, pp. 28, 36.) Or to state the case differently, being authorized and compelled by law to carry persons on their road, and made liable for neglect of duty, both by statute and common law, they may by agreement with the passenger exempt themselves from the performance of duties imposed or required by the law for the safety of the citizen. Nay, ·that they may contract to relieve themselves from any degree of negligence or culpable omission of duty. In the present case the charge of the judge in its entire scope and meaning was, that the plaintiff could not recover unless the. death of his intestate was the result of gross or culpable negligence of the defendants; yet this is claimed to have been erroneous, because such intestate had specially stipulated with the company to assume all risks of the transit, whether occurring from their culpable negligence and misconduct, or otherwise. In short, that they had secured, by contract with the intestate, a sort of license or right, so far as respected him, to be negligent; and no matter, though the

roadway and vehicles be defective and insufficient, and the carrier's employees criminally negligent, and from these causes he is injured, there is no remedy.

In March, 1855, the defendants were exercising the double employment of common carriers of property, and carriers of persons, by railroad between Buffalo and Albany. As carriers of property, by the common law, their liability was that of insurers against all except the act of God and the public enemies; and as carriers of persons they were responsible for the slightest neglect of themselves or their agents resulting in injury. In the latter capacity their duty extended to the exercise of the utmost foresight and prudence in anticipating and guarding against possible dangers arising from the imperfections of the road or the vehicles run on it; and they were not only responsible for their own neglect of duty in providing a sufficient roadway and carriages for safe transportation, but also for the negligence of those acting in their behalf, in the control and management of the road and the transportation. As carriers of property, Ward, the plaintiff's intestate, a drover residing in Ohio, engaged with them for the transportation from Buffalo to Albany, of five hundred, or two carloads, of live hogs. A special agreement for their carriage was entered into, which, by its terms, restricted the common-law liability of the carrier in certain respects. Ward assumed the risks of injuries which the hogs, or either of them, might receive, in the transit, in consequence of any of them being wild, vicious, unruly, weak, escaping or maiming themselves or each other: or from delays: or in consequence of heat, suffocation or other ill effects of being crowded either upon the cars, or by the owner feeding the stock or otherwise. Also, all risk of loss or damage sustained by reason of any delay in the transportation, or from accidents that might happen in consequence of insecurity in the floor, frame or doors of the cars in which the hogs were to be transported, and from any risk attending the loading and unloading of the hogs, the company furnishing the necessary laborers to assist. Beyond these assumed risks, the carriers were in no way absolved from

their common-law obligation to safely transport and deliver such property to the owner at the point of destination. If any loss or damage occurred from injury to the hogs, from causes not embraced in risks assumed by the owner, the carriers were bound by their common law obligations. There is no pretense that the owner assumed all risks, and that by express agreement of the parties, the relation of the carrier as to the particular transaction was changed from that of a common carrier to an ordinary bailee, and from a public to a private carrier for hire. All that can be said is, that the legal effect of the agreement was to exonerate the carriers from risks attending the transportation and delivery, that as common carriers, and in the absence of any agreement, they were subjected to by law. No question, however, arises in this case as to the safe transportation and delivery of the hogs, or as to any liability of the company in respect to the carriage of the property.

As the owner was to feed and see to the condition of the hogs during the transit, and the carriers were to be relieved from the duty of taking care of them, the agreement contemplated that a person or persons on behalf of such owner should accompany the train to discharge the duty, but the sum paid to the carriers was evidently intended as a compensation both for the transportation of the hogs and the passage of the persons in whose charge, for certain purposes, they were to be. In no just sense could these persons be regarded as gratuitous passengers; and although the carriers assume to treat them as riding free, they were not; as it was a condition of the contract that they were to ride with the train to take care of the stock, and the consideration paid to the defendants was as well for such passage as for the carriage of the property itself.

The agreement, therefore, related to the transportation of property, and its whole intent and effect were to absolve the defendants as common carriers from certain specified risks that were otherwise imposed on them by law. In the instrument, however, is found this clause: "And it is further agreed between the parties hereto, that the persons riding free to take charge of the stock, do so at their own risk of personal injury

from whatever cause." Ward, the owner, was the person riding on the stock train, of which his two car-loads of hogs formed a part, and he was killed during the transit, as the jury found, through the culpable neglect of the defendants in providing and using an insufficient and unsafe car for him and other passengers to ride in. On the trial, the defendants took the broad ground that this was a valid and binding agreement, and operated to excuse them from any liability for personal injury, or, at least, except such injury arose from willful misconduct. The judge, however, who tried the cause construed the agreement differently; and instructed the jury that if they should find that the death of the intestate was caused by gross negligence on the part of the defendants, without fault on his part, they were liable notwithstanding the agreement. The judge was not requested to define what he meant by the term "gross negligence," in its application to the case; but if the theory of the plaintiff as to the cause of the injury was the correct one (and that question was fairly submitted to the jury), within all the cases, the defendants were grossly and culpably negligent. A railroad company that shall neglect to provide safe and road-worthy vehicles for the transportation of persons, when the omission to do so is fraught with imminent danger to human life, and injury occurs thereby, is not only culpably negligent, but, I think, practises a fraud upon, and exhibits bad faith in respect to those whom they have undertaken to carry.

The accident resulted (as the jury must have found) from the use by the defendants of an unsafe and dangerous car, with a flattened wheel, which caused it to leave the track. Providing and using such a vehicle was the negligence of the carriers, culpable and inexcusable. It is in this case therefore quite unnecessary to inquire whether there is really anything practical in the definition of the degrees of negligence heretofore attempted by courts and text writers, or whether the carriers, being a corporation, may contract against liability for the negligence of its employees and servants.

Smith *v.* The New York Central Railroad Company.

We come now to a consideration of the nature and effect of the stipulation in respect to personal injury of persons in charge of the stock introduced into the agreement for the transporta- tion of the property. It is to be observed, that although the freight agent of the company testified that Ward was furnished with a pass, the form or tenor of it was not shown; and if the defendants have succeeded in limiting their liability as carriers of passengers, it is wholly by force of the stipulation above referred to: Ward himself being the person who went on the train to take care of the hogs.

Conceding for a moment that the defendants, as passenger carriers, might enter into a valid contract with a passenger to be absolved from liability for personal injury to him, the first inquiry that naturally arises is, whether this effect can be legally given to the agreement in this case, in exoneration of liability for injuries to Ward, the plaintiff's intestate, or whether really it has any binding force. The carriers and Ward agree, not that the latter shall assume all risks of personal injury, but that the persons who may ride on the train to take charge of the stock will do so. Now, suppose a person other than Ward should have accompanied the train to take care of the stock (and the agreement clearly contemplated such a case) and was injured by the carelessness of the defendants, it could scarcely be pretended that the company would not be liable. Such person would have made no agreement to assume any risk and because the carriers have agreed with another that he will ride at his own risk of personal injury, they cannot thereby avoid their legal responsibilities. It is in no sense his agree-ment, nor is he a party to it. If the agreement would have no binding force upon such a person, why upon Ward, who accidentally occupied his place? Can the agreement operate differently in respect to persons in the same class—binding one and having no force as to the other? Shall it be held to limit the carrier's liability as to Ward, and to have no effect in that direction as to another person occupying the same relation? Had the agreement been that Ward himself should ride on the train to take care of the stock, at his own risk of personal

injury, from whatever cause, and such a contract was valid, a different question would be presented. But that is not this contract. Here the carriers and the owner of property contract for its transportation, and as parcel of the contract the owner is to take care of it on the transit, and to that end he must employ persons to accompany the train, and he stipulates that these persons shall ride at their own risk of personal injury. The owner may or may not be one of these persons, but if he should happen to be, have the carriers by force of the stipulation succeeded in relieving themselves from responsibility for an injury to him, resulting from their negligence? I think not. If carriers of persons by railroad are to be permitted to contract against liability for their own negligence, such contract should be at least directly with the contracting party, and clear and definite as to injuries to him. A contract between such carriers—who are simultaneously exercising the employment of common carriers of property—and the owner of property, that persons riding on the train in charge of such property, do so at their own risk of personal injury, is not of that character.

But if this be an incorrect view, and the contract is to be treated as one between Ward and the defendants, as carriers of persons in respect to injuries to him occurring in the transit, we are next to consider whether a carrier and passenger can make a valid contract that shall operate to excuse the former from all liability for personal injury to the latter; and if so whether the accident or negligence which caused the injury complained of was within the scope and spirit of the agreement actually made.

1. The defendants claim that this was a contract releasing them from all liability for personal injury to Ward, except such injury arose from their willful misconduct. But it is unnecessary to add this qualification, as by its terms all risks are assumed from whatever cause. Was such a contract a valid one? With regard to a special contract with a common carrier for the carriage of property, there are no considerations affecting the public interest or policy forbidding it being made. The parties to such a contract are alone interested; and al-

Smith *v.* The New York Central Railroad Company.

though the carrier exercises a sort of public employment, the obligations which the law imposes on him inure exclusively to the benefit of the owner of the property. The owner may agree to relieve the carrier from his obligations as an insurer, and limit them as to the particular transaction to those of a private carrier for hire; and the interests of the public will be in no way affected thereby. But how is it when a railroad company is the carrier of persons, and engaged in the business of operating a railroad for the public use? Whether a contract shall be avoided on the ground of public policy, does not depend upon the question whether it is beneficial or otherwise to the contracting parties. Their personal interests have nothing to do with it; but the interests of the public are alone to be considered. The state is interested not only in the welfare, but in the safety of its citizens. To promote these ends is a leading object of government. Parties are left to make whatever contracts they please, provided no legal or moral obligation is thereby violated, or any public interest impaired; but when the effect or tendency of the contract is to impair such interest, it is contrary to public policy and void. Contracts in restraint of trade are void, because they interfere with the welfare and convenience of the state; yet the state has a deeper interest in protecting the lives of its citizens. It has manifested this interest unmistakably in respect to those who travel by railroads. Her policy, and the uniform policy of the law has been, in regard for the safety of the citizen who has recourse to this dangerous mode of travel, upon a road and by agencies over which he has no control, to hold the carriers to the exercise of the utmost foresight even as to possible dangers, and the utmost prudence in guarding against them. This policy is dictated both by a desire to protect the citizen, and because the public is interested in his safety. Whether a carrier to whose exclusive charge the safety of a passenger has been committed, by his own culpable negligence and misconduct, shall put in jeopardy the life of such passenger, is a question affecting the public and not the party alone who is being carried. It is said that

the passenger should be left to make whatever contract he pleases; but, in my judgment, the public having an interest in his safety, he has no right to absolve a railroad company to whom he commits his person from the discharge of those duties which the law has enjoined upon it in regard for the safety of men. Can a contract, therefore, which allows the carrier to omit all caution or vigilance, and is, in effect, a license to be culpably negligent to the extent of endangering the safety of the passenger, be sustained? I think not. Such a contract, it seems to me, manifestly conflicts with the settled policy of the State in regard to railroad carriage. Its effect, if sustained, would obviously enable the carrier to avoid the duties which the law enjoins in regard to the safety of men, encourage negligence and fraud, and take away the motive of self-interest on the part of such carrier, which is perhaps the only one adequate to secure the highest degree of caution and vigilance. A contract with these tendencies is, I think, contrary to public policy, even when no fare is paid.

In this case, however, Ward was not a gratuitous passenger. He had compensated the carriers not only for the transportation of his stock, but for the carriage of himself to take charge of it. He is to be regarded in the same light as a passenger who has paid a compensation for being carried. Whatever may be said, therefore, in respect to a person riding free in pursuance of an agreement to assume all risks, the direct question here, is, whether it is against the policy of our laws for a railroad company carrying a passenger for a compensation. to contract with such passenger for exemption from liability for its negligence. That it is I cannot entertain a doubt. If, then, the agreement in this case is to be construed as releasing the defendants from all liability for personal injury to Ward from their own culpable negligence and misconduct, and absolving them from all responsibility for his safe carriage, it is void.

2. But was that the tenor and effect of the agreement? The contract, in which the stipulation is found, related to the transportation of his hogs, and that contract provided that the owner should assume certain risks in respect thereto, and

Smith v. The New York Central Railroad Company.

either accompany the train himself to take care of them, or furnish other persons to discharge that duty. With respect to the property, the company assumed to safely transport it and take upon themselves all risks of transportation except those specified. They were to furnish the means of transportation — provide the road, attendants, supervision, and motive power, and secure sufficient cars, except in the single respect to the floors, frames, and doors of such cars. As to these things, there was no attempt to limit their common-law liability as carriers of property, and for loss or damage occurring to the owner during such transportation from causes other than those, the risks of which he had assumed the liability as common carriers continued. They were responsible for any loss to the owner resulting from neglect to provide either a sufficient roadway or secure and road-worthy vehicles for the transportation, except as respected their floors, frames and doors. They were liable for any degree of negligence of themselves or their servants, in the transit, except as to those things which the owner undertook to relieve them from, and take upon himself the risk. This is the nature and effect of the contract as to the carriage of the property. But in it is embodied the stipulation that persons accompanying the train, to take charge of the stock, do so at their own risk of personal injury from whatever causes. It was a convenience to both parties, and a part of the contract, that a person should ride along to take care of the stock. Now we are asked to presume, whilst the agreement bound the carriers to safely transport the property, and the law held them responsible as insurers except so far as they had succeeded by agreement to limit such liability, that the parties intended that the persons in charge of the property should assume all risks of personal injury, whether resulting from the culpable negligence and misconduct of the carriers or otherwise: and that it was intended that the carriers should be held for loss occurring from their negligence in the transportation of the property, but absolved from all liability for injuries caused by such negligence, however gross or culpable, to the persons in charge of

it. This could not have been the intention, nor will the law presume that it was, so long as there were other risks to which the stipulation might naturally and properly apply, and more consistently with honesty and fair dealing. It will not be presumed that Ward intended to hold the carriers for loss occasioned by their omission of care in the transportation of his property, but to excuse them from any liability for injury to himself whilst taking care of it, though having no control or management whatever of the railroad: nor that the carriers, after becoming a party to a contract for the carriage of live stock, a part of which contract was that a person should ride on the train to take care of such stock, intended that that person should take on himself the risk of personal injury, even though they should omit the ordinary precautions which a man observes in taking care of himself or his own property. The most reasonable construction to be given to the stipulation, in view of the circumstances under which it was made, and the only one, I think the law will permit, is this: the persons riding on the train to take care of the stock will do so at their own risk of personal injury from causes not produced by the willful misconduct, gross negligence, or want of ordinary care of the carriers or their servants, in the control and management of the railroad on which themselves and the stock were to be carried. Had Ward, in general terms, agreed to assume all risks as to the transportation of the stock, the carriers would still have been liable for gross negligence or a want of due care. The parties might by such agreement have succeeded in establishing the relation, as to this transaction, of an ordinary bailee and private carrier for hire. But a private carrier for hire is answerable for gross negligence or a want of due care. There are cases in respect to the transportation of property, giving a similar construction to stipulations as broad and comprehensive as the present one. In *Alexander* v. *Greene* (7 Hill, 533), the contract was to tow a canal boat to Albany, at the risk of the master and owners thereof. The canal boat was run upon a rock and her cargo lost; but it was held in the court of errors that the contract did not exempt the defendants from the con-

sequences of their gross negligence or want of ordinary skill and care, and that that could not have been the intention of the parties.   The case of *Wells* v. *The Steam Navigation Company* (4 Seld., 375), involved the same question and upon a precisely similar contract.   Although contending that the defendants were only answerable for injuries occasioned by fraud or want of good faith, the court of appeals held that the contract did not protect the defendants from the gross negligence of their servants in navigating their vessel, and that a stipulation or a contract to exempt from gross negligence, must be specific and distinct, or it will not be implied from a clause containing a general expression that might naturally apply to other risks.   In *Sager* v. *The Portsmouth Railroad Company* (1 Am. Railway Cases, 172), the question arose upon the liability of the carriers for the loss of live stock by an accident upon a railroad.   The contract for the carriage was in the following form: "We take upon ourselves the risk of all and any damages that may happen to our horses, cattle, &c., and that we will not call upon said railroad company, or any of their agents, for any damages whatsoever;" yet it was held that this was not a stipulation for willful misconduct, gross negligence or want of ordinary care in the defendants or their servants, either in respect to the railway or its management. A similar conclusion was reached in the case of *The New Jersey Steam Navigation Company* v. *The Merchants' Bank* (6 How. U. S. R., 383), which was an action against a common carrier for the loss of the goods, when the clause on which the carrier relied for exemption was, "*at the risk of the master and owners.*"

On the whole, therefore, there was no error in holding at the circuit, that notwithstanding the stipulation, the defendants were liable for gross negligence.   The instructions to the jury were, that if they came to the conclusion, from the evidence, that the death of Ward was caused by gross negligence on the part of the defendants, without fault on his part, their verdict should be for the plaintiff; otherwise they should find for the defendants.   This was quite as favorable to the defendants as they were entitled to claim.   The evidence in one view of it,

in my judgment, would not only have justified a finding of gross negligence, but negligence of so culpable a character that had the carrier been a natural person and not a corporation, he would have been liable to a criminal prosecution.

The judgment of the supreme court should be affirmed.

DENIO and DAVIES, Js., were of opinion that there is no general public policy forbidding a contract by which a railroad corporation should be exempt from liability for the negligence of its agents in respect to a purely gratuitous passenger, but they thought that the railroad act and its policy prohibit a contract for such exemption with a paying passenger. They were for affirmance, on the ground that plaintiff's intestate was not a gratuitous passenger.

SMITH, J., was for affirmance on the ground that the negligence was that of the corporation itself. SUTHERLAND, J., for affirmance, upon the ground stated by him in *Wells* v. *The same Defendant*, that the contract for exemption was void irrespective of the question whether the transportation was gratuitous or for hire.

ALLEN, J. (dissenting.) The action by representatives of one whose death is caused by the wrongful act, neglect or default of another, is confined to cases in which the act, neglect or default causing the death is such as would (if death had not ensued) have entitled the party injured to maintain an action for damages in respect thereof. (Laws of 1847, ch. 450, p. 575, § 1.) Therefore it must be some act, neglect or default of which the deceased, had he survived, might have complained, and for which the defendants would have been liable to him. If, by reason of the relation of the parties, or for any other reason, the defendant owed no duty to the deceased, and was not bound to do or forbear to do any act in respect to the deceased, the doing or omission of which caused the injury, neither the deceased, at common law nor the representatives, under the statute, can maintain an

action. The duty of the party to be charged must arise from contract or be imposed by law resulting from the relation of the parties, and if no duty exists resting upon one of these foundations, then there can be no act, neglect or default which would give the party injured or his representatives an action, although under other circumstances the same act or omission would constitute a breach of duty and charge the guilty party with the consequences. The act, neglect or default which gives the action, takes its character as actionable or not actionable under the statute, not alone from its intrinsic and abstract qualities, but from the relation of the parties implicated. Had there been no special contract qualifying the common-law liability of the defendants as carriers of persons and property, no question could have been made as to their liability in this action. They would have been bound to respond, not only for gross but for any the slightest neglect on the part of their servants and agents. Whatever doubt may have at one time existed on the subject, it is now well settled that bailees, common carriers and others may relieve themselves of liabilities resting upon them at common law by special contract with those interested, and for whose benefit and protection such liabilities have been deemed necessary. The common law, from motives of public policy and for the protection of the public, has made common carriers of property chargeable with all damage to, and loss of property in, their possession as carriers, except only where such damage or loss has arisen from inevitable accident, sometimes called "the act of God," or the public enemies. Carriers of persons have, for similar reasons, been subjected to very stringent liability, and are held to the highest degree of care and skill, and made liable for the slightest neglect. Indeed, so exacting is the law, although founded on the wisest of reasons, that the consequences of the liabilities of this class of public servants are in extreme cases almost penal in their nature. But those rules are established and take the place of a special contract, not for the benefit of the public, but for that class of the public who have to do with those classes and for the protection of those who may suffer

by neglect of duty on their part; and unless there is some exception which is to operate in this class of cases which does not affect any other right or duty, or the relation of parties in other situations, the individual for whose benefit the liability exists, and the duty is imposed, may waive them by agreement. No principle is better settled than that a party to whom any benefit is secured by contract, by statute, or even by the Constitution, may waive such benefit, and the public are not interested in protecting him or benefiting him against his wishes. (Broom's Leg. Max., 309; *Lee* v. *Tillotson*, 24 Wend., 337; *People* v. *Murray*, 5 Hill, 468; *Donnelly* v. *Corbett*, 3 Seld., 500.) The public have no interest in the question, which of the two, A or B, shall take the risk of the seaworthiness of a ship, or the fitness of a railway carriage, or the care and faithfulness of a third person employed in the performance of a duty, in which either or both have an interest, although by certain general rules the law has declared that in the absence of any contract the risk shall be upon A and not upon B. But if B elects to relieve A, and to assume his risks and liabilities, the public are not at all concerned and have no occasion to forbid such contracts. If the contract is induced by fraud or duress, it is, of course, void, and the common-law liabilities of the parties will remain unchanged. The character of the liability which one contracting party assumes in relief of the other, cannot affect the validity of the contract, it being wholly personal to the parties. If one is unwise enough deliberately to excuse another from liability for gross and very gross neglect, there is no good reason why he should not be permitted to do so, even for personal neglect of that character: that is, there is no reason why the contracting party should not be estopped from setting up a claim against his express contract not to do so. If the public have any claim against the negligent party, either criminally or otherwise, it will not be affected by the contract, and if the contract be in violation of the law, or for the commission of a criminal offence, neither party can maintain an action against the other upon it or in respect to the transac-

tions to which it relates. Such a contract will not be construed—except its terms compel such construction—as authorizing or contemplating a crime, or as providing against the consequences of a crime, and hence would not ordinarily be held to embrace acts of culpable negligence resulting in death under circumstances that would constitute manslaughter, that is, culpable negligence of that degree in the principal and the contracting party. But the reason does not extend to or prohibit a contract shifting the pecuniary liability of A, for the acts of C to B, although such acts of. C might be such as would subject him to punishment for manslaughter, for causing death by his culpable negligence, or for any other offence. A man should not be permitted to contract for impunity from his own criminal acts, but there is no reason why he may not contract for such impunity from the acts of his agents, for whom and for whose acts he is only pecuniarily responsible, in the nature of a guarantor. A man may be lawfully insured against risks and liabilities of all kinds, and this amongst others. The liability of the principal for the acts of the agent is the same as, and no different from, any other pecuniary liability resulting from contract or the relation of the parties. There is no recognized public policy which requires an individual under all circumstances to bear or be responsible for the grossest negligence, or even the fraud, of his agents and servants. Unless he is specially exempted by statute or express agreement, the law for good reasons makes him so liable. The well-understood doctrine of *respondeat superior* furnishes the rule in such cases. But in fire policies the insured has indemnity against the negligence of his most confidential servants and agents, and in marine risks the undertaking of the underwriter may and does ordinarily include the fraudulent and barratrous acts of the master and mariners who are the employees and agents of the insured, notwithstanding the acts may constitute an offence made criminal by the laws of the land. (1 Story's Laws, 84; *Cook* v. *The Commercial Ins. Co.*, 11 J. R., 40.) " The modern cases go far to establish the rule that for the conduct of the master or mariners, in the practical

navigation, care and management of the vessels after the com-
mencement of the voyage, the insurers are responsible, provi-
ded the actual loss arise from one of the perils insured against,
although such peril was occasioned or increased by the negli-
gence, carelessness, bad seamanship or other misconduct of
the master and mariners, not amounting to barratry." (Per
SHAW, Ch. J., in *Copeland* v. *New England Marine Ins. Co.*, 2
Met., 440; *Dixon* v. *Saddler*, 5 M. & W., 405.) Baron PARKE,
in the last case, says: "The great principle established by the
more recent decisions is, that if the vessel, crew and equip-
ments be originally sufficient, the assured has done all he
contracted to do and is not responsible for the subsequent
deficiency occasioned by any neglect or misconduct of the
master or crew." In this class of cases the law of *respondeat
superior*, adopted as an equitable and a reasonable rule in the
absence of any contract, is suspended by the agreement of the
parties, the courts only looking to ascertain what in truth the
parties have as between themselves agreed, shall be the rule
and measure of responsibility. Public policy does not inter-
fere with the freedom of the parties to make such contract as
their own interests may dictate, and if a party may lawfully
procure another to indemnify him against personal loss,
by insurance against the negligence and fraud of his own
agents, *a fortiori* he may, by the deliberate agreement of a
third person in respect to whom he stands in the relation of
insurer for the acts of his servant under the doctrine of *respon-
deat superior*, be relieved from that responsibility. The party
may become his own insurer as he might have insured the
principal.

Another class of cases establishes a principle utterly at war
with the doctrine contended for, that public policy forbids a
contract by which a principal may be discharged in advance
from responsibility for the negligence of his servants, what-
ever the degree of negligence may be. I refer to the case of
*Coon* v. *The Syracuse and Utica Railroad Company* (1 Seld.,
492), and the cases in this and other states preceding and fol-
lowing it, which decide, that a principal is not liable to one of

Smith *v.* The New York Central Railroad Company.

.his agents or servants for injuries sustained through the negligence of another agent and servant, when both are engaged in the same general business. Chief Justice SHAW in *Farwell* v. *The Boston and Worcester Railroad Corporation* (4 Met., 49), lays down the general rule, " that he who engages in the employment of another for the performance of specified duties and services for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services, and, in legal presumption, the compensation is adjusted accordingly." If a contract may be implied from the relation of the parties, which shall thrust aside the common-law rule of *respondeat superior*, there would seem to be no reason why it might not be put aside, by the voluntary and express agreement of those concerned. The question in all cases of special contract, is not what the law upon the ordinary principles which govern in the establishment or application of rules in the new and ever varying cases that constantly arise, would adjudge to be the reasonable and just duties and liabilities of the parties to each other, but what have the parties agreed in relation to their respective duties and liabilities. What relation have they, by the terms of their contract, established between themselves? The law only undertakes to do that for parties, when they omit to do it themselves, or rather the relation will be presumed to have been constituted in reference and subject to the ordinary and established rules governing such relation, when the parties are silent upon that subject. The attempt to regulate the right of parties to contract, by the shadowy and vague distinctions between the different degrees of negligence, and to hold that they may shift responsibilities for the consequences of ordinary neglect of third persons, but may not do so in respect of gross neglect of the same persons, is not satisfactory, for two reasons: 1st, it is not founded upon any principle, and 2d, it is not capable of any certain and satisfactory application to individual cases as they arise. Attempts have been made to fix a liability upon the distinction between gross negligence and negligence merely, but courts have been compelled to abandon the attempt, and to say that negligence

does not change its character, and become anything but negligence, by the application of any epithet to it. The earlier cases have, so far as practicable, been reconciled with the more modern decisions, although all cannot be reconciled in this way, upon the ground that what was called in the earlier cases "gross negligence," was in fact actual misfeasance in the bailee. (*Hinton* v. *Dibbin*, 2 Q. B., 646; *Owen* v. *Burnett*, 2 Cr. & M., 358; *Wyld* v. *Pickford*, 8 M. & W., 443.) No definite meaning has yet been given to the term gross negligence, or any definition which will not leave the whole question to the discretion of the tribunal, that is to pass upon any particular case. The idea of distinguishing between gross negligence and negligence merely, as affecting the validity of contracts, of carriers and other bailees, had its origin in the supposed inviolability of the rule establishing the liability of those engaged in that branch of public employment. With the introduction and full establishment of the more reasonable rule, that the duties resulting from this employment, alike with every other employment, were the subject of special contract, this idea has gradually vanished: it is now entirely abandoned in England and has never been so firmly established anywhere as to have become an authoritative rule of decision. *Wyld* v. *Pickford*, *supra*, was an action against a carrier, and the question had respect to the limitation of the common-law liability by a notice, which in England is held to have the effect of a contract—an effect denied to it by the courts of this State—and the defendant was held liable for a misdelivery of the package. PARKE, B., in giving judgment, says, with some hesitation, "The weight of authority seems to be in favor of the doctrine, that in order to render a carrier liable after such notice, it is not necessary to prove a total abandonment of that character, or an act of willful misconduct, but that it is enough to prove an act of ordinary negligence, gross negligence in the sense in which it is understood in the last mentioned cases. (4 B. & Ald., 30, and 3 B. & B., 182.") The case was decided in 1841. In *Shaw* v. *North Midland Railway Company*, 13 Q. B., the defendants were held not liable for an injury to a horse while

being transported by the defendants, resulting from a defect in the car, which was pointed out to a servant of the company, and who undertook but failed to remedy it, under a declaration charging the company as common carriers upon their duty "safely and securely to carry the horses," &c. The horses had been received, and a ticket given for them with a memorandum thereon, that the ticket was issued "subject to the owner's undertaking all risks of conveyance whatsoever, as the company will not be responsible for any injury or damage (however caused) occurring to horses or carriages while traveling or unloading." The court held, that the carrier was only liable upon and according to the terms of the contract, and did not become liable as carriers by reason of the negligence of the servants of the company. Lord DENMAN, Ch. J., says, "It may be, notwithstanding the terms of the contract, the plaintiff might have alleged that it was the duty of the defendants to have furnished proper and sufficient carriages, and that a loss happened from a breach of that duty." This would depend, of course, upon the true construction of the contract. Under a similar contract, the court held, in *Austin* v. *The Manchester, &c., Railway Company* (10 C. B., 454), that giving to the words of the contract their most limited meaning, they must apply to all risks of whatever kind, and however arising, to be encountered in the course of the journey; and, therefore, that the company were not responsible for injury done to a horse from the firing of a wheel, in consequence of the neglect of the servants of the company to grease it. CRESSWELL, J., delivered the opinion of the court, and remarked, that there was nothing in the declaration amounting to a charge of misfeasance or renunciation of the character in which the defendants received the goods, and after speaking of the risks assumed by the plaintiff, one of which was that of the wheel taking fire from a neglect to grease it, adds, "whether that is called negligence merely, or gross negligence, or culpable negligence, or whatever other epithet may be applied to it, we think it is within the exception from responsibility provided by the contract." The same principle is applied

in *The York, Newcastle and Berwick Railway Company* v. *Crisp* (14 C. B., 527), where the damage was caused by delay in the forwarding of the cattle which were the subject of the contract, and in that case there was an express promise by the agent of the company to forward them at a particular time, no excuse was shown for the delay, and the receipt, which was the evidence of the contract, was given after dark, and not read by the party. In excusing the principal from liability for the negligence of his servants in acts occasioning injury to a fellow servant, no distinction is made in any of the cases between the degrees of negligence. For injuries to a servant traceable to the neglect of another servant as the proximate cause, the master is not liable, no matter how gross or culpable that neglect may be. (*Wigmore* v. *Jay*, 5 Exch. R., 353; *Albro* v. *Agawam Coal Company*, 6 Cush., 75; *Boldt* v. *New York Central Railroad Company*, 18 N. Y., 432; *Gillshanon* v. *Stoney Brook Railroad Company*, 10 Cush., 228; *Russell* v. *Hudson Railroad Company*, 17 N. Y., 134; *Priestly* v. *Fowler*, 3 M. & W., 1; *Cone* v. *Syracuse and Utica Railroad Company*, 1 Seld., 492.)

In the absence of fraud or other circumstance vitiating the contract, the parties may divide and share the risks of travel and transportation concerning which they contract, and deal with each other as they please. All that courts have to do is to interpret the contract and ascertain what risks come within its terms, and place them upon the party assuming them by the terms of the agreement. It is the intent and mind of the parties as declared by the contract that determines the liability for risks of the journey or of the carriage, and damages accruing in the performance of the contract. Perhaps it would require very explicit language to excuse a party from the consequences of his own fraudulent act or any willful or wanton neglect to provide ordinarily safe and suitable conveniences and means of transportation or travel, and fit and proper agents for the performance of the contract, such as the other party had a right to expect would be provided. In *Keegan* v. *The Western Railroad Corporation* (4 Seld., 175), this court, distin-

guishing, not between negligence and gross negligence, but between the negligence of a servant and what was regarded as the actual fault or misconduct of the defendant, held the Company liable for using a defective and dangerous locomotive, by which one of its servants was injured. It may be, also, that, in the absence of an express provision in the contract to the contrary, a carrier of persons and property will be held to the duty of furnishing proper and reasonably safe carriages, at least such as are not known to be unsafe, and provide fit and suitable agents and such as are reputed faithful and trustworthy, as upon an implied contract to that effect — implied as a condition precedent to the agreement of the other party to the contract to take upon himself the risks of the travel and transportation proper. It might well be said that, in assuming the risks of the carriage, the traveler or owner of the property only had in his mind and intended to assume the proper risks of the transportation, and not to relieve the carrier from ordinary good faith in the performance of his duty. The most common risks in railroad traveling arise from the neglect of the engineers, conductors, switch-tenders and other subordinate agents in the progress of the journey; and such must be supposed to be in the mind of the parties when providing for risks by the contract. If these are excluded, the contract will be substantially unmeaning. They are the perils incident to that method of travel and transportation; and whether the neglect is such as may be called gross, in a servant upon every other occasion vigilant and faithful, cannot be material. That is one of the risks which attach to the running of every railroad train. Some person upon whom the safety of the train depends may fall asleep, become confused, be suddenly deprived of his reason, or purposely do some wicked act by which the train and all on board may be greatly periled and damaged, if not destroyed; and yet, as one of the contingencies and risks, it must be held to be in the minds of the parties and provided for in the compensation.

A statute exempting a carrier from liability in certain cases includes losses from gross negligence, as well as those arising

from slight negligence. (*Hinton* v. *Dibbin*, 2 Q. B., 646.) And there is no reason why a statutory exemption should be more extensive than an exemption by contract in the same terms. There is no difficulty in interpreting the contract here. The deceased agreed that, on riding free (as he did), to take charge of his stock, he would do so at his own risk of personal injury "from whatever cause."

The contract is as comprehensive and worded in the very terms of that in *Austin* v. *Manchester Railway Company*, and *The York, &c., Railway Company* v. *Crisp* (*supra*), which was held to excuse the Companies from the consequences of the gross negligence of their agents. It is true that carriers of persons by land or water, by any of the ordinary means of travel and conveyance, are not common carriers, or, in any sense, bailees; but, in many respects, they are governed by the same rules, or rules of a like character, and having their foundation in the same general principles, and the analogies between the two classes of public servants are very strong. In respect to both, the law, in the absence of any express contract, fixes the terms of the contract and determines the relative rights and duties of the respective parties. There is no reason, growing out of the service to be performed, or anything connected with the contract or duty or the interests of the public, which should prohibit, in either class of contracts, an express provision varying and shifting the common-law rights, risks and responsibilities of the parties, as connected with and incident to the contract, and the performance of the duty growing out of the contract. This, of course, would not give countenance to the idea that a contract might be made authorizing or excusing a criminal act. Such a contract could not be enforced by either party.

As, in the case of common carriers of goods and other bailees, the common-law liability, established for good reasons and for the protection of the public, may be varied by express contract, the corresponding liabilities attaching to carriers of passengers by the same common law may well be subject to variation by the deliberate assent or agreement of the parties concerned.

A criticism is made upon the contract in this case, and was adopted and sanctioned by the learned justice upon the trial. The provision in the contract is, that "the persons riding *free* to take charge of the stock, do so at their own risk," &c.; and it is said that the deceased was not riding free. The justice said to the jury that it was not strictly accurate to say that he was traveling under a free pass. In the view of a gratuity he was probably not traveling or riding free, that is, he was not riding without some equivalent, and that equivalent was the consideration growing out of the contract for the carriage of the cattle of the deceased. But he did not pay fare as a passenger, that is, he paid only for the carriage of his cattle, and nothing as a distinct consideration for his own carriage; and, in that sense, he was traveling or riding free. In that sense, the term "riding free" was used in the contract. He availed himself of that provision, and rode in the same train with his cattle, to take charge of them, without paying for his passage. He rode under a pass entitling him to the ride, by the terms of which he took "all the responsibility as to the injury of himself or the stock." The principles which should, in my judgment, govern this case, were decided by this court in *Perkins* v. *The Same Defendants*, at the present March term. The only distinction between the cases is, that, in the one cited, the deceased was riding upon a "free ticket," a pass, given without consideration and as a gratuity. The principle being conceded, that special contracts may be made by railroad companies, exonerating them from some or all of the ordinary risks of travel to passengers over their road, it would seem to follow that, in every case except where there was a simple understanding to carry for the fare allowed by law, or fixed by the company in pursuance of the authority of law, a company might contract with the traveler for such division of the risks as should be agreed upon. What should be a sufficient consideration for the agreement of the traveler to assume the risks, would be for him to determine. The courts would not assume his guardianship, and pass upon the adequacy or sufficiency of the consideration. The law, perhaps, would not tolerate

the imposition of a ticket upon a passenger, paying the usual full fare, which would, by its terms, release the company from any of its ordinary common-law liabilities. But where a special contract, a contract out of the usual and ordinary course of things is made, and for a consideration other than that of the usual and ordinary fare for the carriage of passengers, the liabilities may be regulated by that contract. Whether the consideration upon and for which the traveler takes upon himself, in discharge of the company, certain risks, is the whole fare, or half fare, or any outside and independent consideration, is not material. It is enough that a special contract is made, upon a consideration which the parties have agreed to be adequate. Most certainly, the courts will not, in an action upon a policy of insurance, inquire into the sufficiency or adequacy of the premium as a consideration for the risks assumed. The deceased here agreed, in consideration that the defendants would take his stock at a given rate for transportation, and permit him to ride over the road without additional charge to take charge of the stock, that he would assume and bear all the risks of the journey; and who shall sit in judgment upon this contract, and say it was without consideration, or that the consideration was unlawful, or that the contract was against public policy? As said before, the decision in *Perkins* v. *The New York Central Railroad Company* is decisive of this case. Had the case been put to the jury solely upon the question whether the defendants, in the carriage of the deceased, made use of a car unfit and unsafe for the purpose, and known by the managers of the Company to be unfit and unsafe, a different question would arise, and one which, as it cannot be now decided, I do not care to discuss. Its consideration would involve a critical and careful examination of the doctrine of corporate responsibility as connected with the acts of its directors or its principal and general managers, as distinguished from the acts of servants and agents in a subordinate capacity and subject to the control and direction of the superior or general officers and managers of the corporation. It is sufficient that, in this case, the learned justice, in charging

the jury, distinguished between mere negligence and "wrongful or culpable negligence" on the part of the defendants and their agents; holding them excusable from the consequences of the former, but not of the latter, and that, if the contract was so construed as to include "wrongful and culpable negligence" of the defendants or their agents, it was "void as against public policy, and, either way, the agreement was no bar to the action." There was nothing in the charge to qualify this proposition; and this is clearly erroneous within the case of *Perkins* v. *The New York Central Railroad Company*. So long as the negligent or wrongful act is that of a·servant or agent, there can be no doubt, I think, that the Company may contract for relief from liability for it; but the charge was to the contrary of this proposition. The use of the cars with a flattened wheel is alluded to in another part of the charge, and the use of it was charged to be great negligence, especially after its danger had been pointed out to the defendants' employees; and the jury were told, "they would probably have little difficulty in finding that the use of such a car in the transportation of passengers was a reckless exposure of life, amounting to gross negligence." And, for gross negligence of their servants and employees, the defendants were held responsible at the circuit, not on the ground that the furnishing a proper and suitable car was an implied condition of the contract by the deceased to assume the risks of the journey, or the omission to furnish such car a breach of good faith which released the deceased from his undertaking, but on the ground that gross negligence, even of the lowest and most subordinate employee of the Company was not within the contract, or, if within its terms, the contract was void. This position is directly overthrown by Perkins' case, cited above, and by *Shaw* v. *North Midland Railway Company* (*supra*). The cause was submitted to the jury upon this erroneous theory, and the whole tenor of the charge was wrong, and tended to mislead; and, as the exceptions reach the objectionable parts, the error cannot be overlooked.

The cases which are somewhat in point, as involving principles to some extent analogous, are not in conflict with the conclusions to which I have come, but, on the contrary, will, I think, be found on careful examination to justify and bear me out in the result which I have indicated. In *New Jersey Steam Navigation Company* v. *Merchants' Bank* (6 How. U. S., 344), Judge NELSON, while deferring to what seemed to be the leaning of the New York cases, and of the English cases up to that time, yet, in effect, concedes the question to be what was the intent of the parties upon a fair and reasonable construction of the agreement. The loss there arose from the storage of a large quantity of cotton in dangerous proximity to the boiler-deck and steam chimney, and he was of the opinion that this risk was not embraced in the contract by which the Navigation Company were not to be "responsible for the loss of any goods, &c., to be conveyed or transported by Harnden in said crate, or otherwise, in any manner in the boats of said company." Justice CATRON made gross negligence to consist in a failure of the servants of the company "in the lowest degree of prudence to guard against fire," and that such conduct was contrary to common honesty, and that the owners were as liable as they would have been in case of an affirmative and meditated fraud occasioning the same loss, and that the burning was a tort. He was also of the opinion that the boat was grossly and culpably deficient in facilities for extinguishing fires which made her unseaworthy. No case, I think, would now go with him to the full extent of the first part of his opinion, and the latter part is not inconsistent with any proposition advanced by me, and was sufficient to sustain the judgment. Justice DANIEL, with whom Justice GRIER concurred, was of the opinion that the company was not liable for the loss, being exempted by their contract with Harnden, which took from them the character of carriers and charged them merely with certain duties in respect to the goods, for the non-performance of which alone they were liable, and that such liability rested solely in the special contract. Justice WOODBURY declined to express an opinion upon the effect of

the contract. In *Alexander* v. *Greene* (7 Hill, 533), the judges of the court for the correction of errors did not agree in the reasons for reversing the judgment of the Supreme Court. Senator BOCKES thought it against public policy to relieve those engaged in steam navigation, whether in towing of boats or carrying passengers from the consequences of the gross neglect of their servants, but finally was of the opinion that the risk occasioning the loss was not one of the risks intended to be assumed by the owner of the boat towed, and that to exempt the defendants from the legal consequences of their own neglect, the intention to do so should have been clearly and unequivocally expressed. He concludes his opinion thus: "But in this case I conceive no such contract was made, and the defendants remained liable for losses occasioned by ordinary neglect and so the case ought to have gone to the jury." Other senators were of the opinion that the defendants were common carriers, and did not consider the effect of the terms of the permit upon their liability. Senator PORTER was of the opinion that the contract would not admit of a construction that should protect the defendants from a loss arising from gross negligence. It would seem that the case was in truth decided upon the construction of the contract, as was the case of *Wells* v. *The Steam Navigation Company* (4 Seld., 375), upon a precisely similar contract: see *S. C.* (2 Comst., 204). *Dorr* v. *The New Jersey Steam Navigation Company* (1 Kern., 485), decides without qualification that common carriers may limit their liability by an express agreement, that is, that the parties may make their own contract and limit the precise extent of their respective risks and liabilities: and see *Clark* v. *Rochester and Syracuse Railroad Company* (4 Kern., 470), and per ALLEN, J., in *Mercantile Mutual Insurance Company* v. *Calebs* (20 N. Y., 176). Most certainly the result is in harmony with that class of decisions which exempt the principal from losses arising from the ordinary risks incident to the employment of a servant, including the negligence of his fellow servants, and hold him responsible for damages resulting from his own default and misfeasance. The first

class of risks are impliedly assumed by the servant, but the law will not infer that he undertook to relieve the master from the consequences of his own omission of duty, for that would be unreasonable. As said before, the contract before us in terms embraces every degree of negligence that does not impute personal blame to the defendants, and the case is not within the difficulties of construction that were encountered in 7 Hill and 4 Selden.

I am for a reversal of the judgment and the granting of a new trial upon the usual terms.

SELDEN, Ch. J., and GOULD, J., concurred in this opinion.

Judgment affirmed.